IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:21-CV-103-FL

| | | |
|---|---|---|
| RONALD RAY SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAULA S. DANCE, both individually and in her official capacity as Sheriff of Pitt County; ROBERT M. ABBOTT, both individually and in his official capacity as Captain for Sheriff of Pitt County; RODNEY L. JACOBS, both individually and in his official capacity as lieutenant for Sheriff of Pitt County; JOHN E. GUARD, both individually and in his official capacity as chief deputy for Sheriff of Pitt County, | ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 27). Issues raised are ripe for ruling. For the following reasons, defendants' motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff, a former law enforcement officer, commenced this action July 24, 2021, against his former employer, Paula S. Dance ("Dance"), sheriff of the Pitt County Sheriff's Department ("PCSD"); Robert M. Abbott ("Abbott"), captain of PCSD; Rodney L. Jacobs ("Jacobs"), lieutenant of PCSD; and John E. Guard ("Guard"), chief deputy of PCSD. Plaintiff asserts claims against all in their official and individual capacities under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment rights to procedural due process, as well as state law claims for libel, state

constitutional violations, and civil conspiracy. Plaintiff seeks compensatory and nominal damages, declaratory and injunctive relief, costs, and attorneys' fees.

Defendants filed the instant motion seeking dismissal of all claims as a matter of law. Scheduling activities in the case have been stayed pending decision on the motion.

## STATEMENT OF FACTS

The facts alleged in plaintiff's complaint may be summarized as follows. Plaintiff was a justice officer with PCSD from February 5, 2001, until his termination on April 15, 2020. (Compl. (DE 1) ¶ 17). Plaintiff "excelled in the performance of his duties." (Id. ¶ 18). In 2014, PCSD promoted him to the rank of lieutenant and the Greenville-Pitt County Chamber of Commerce named him "Law Enforcement Officer of the Year." (Id. ¶ 19). In 2015 PCSD awarded plaintiff a "certificate of appreciation for his actions in locating a missing and endangered two-month[-]old baby," and in 2016 PCSD awarded him a "certificate of achievement for demonstrated excellence in cardiac arrest management." (Id.). "[Plaintiff] also served as a certified instructor in the specialized areas of Fire Emergencies, First Aid, CPR, and Explosive and Hazmat First Responder." (Id.). At no time during his employment did PCSD issue plaintiff disciplinary actions or sanctions. (Id. ¶ 20).

Defendant Dance is the duly elected sheriff of PCSD, and plaintiff's former supervisor. (Id. ¶ 7). In her role as sheriff, defendant Dance "served as the chief executive officer for [PCSD] with policy-making authority for all matters pertaining to the department." (Id. ¶ 11).

On March 14, 2020, in response to COVID-19, Governor Roy Cooper issued Executive Order Number 117 ("EO-117") prohibiting "mass gatherings," defined as:

> [A]ny event or convening that brings together more than one hundred (100) persons in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, theater, or any other confined indoor or outdoor space.

(Id. ¶ 21).  On March 16, 2020, defendants held a departmental leaders meeting "to address []
PCSD's response to the [COVID-19] pandemic, including to the [g]overnor's then recent issuance
of EO-117."  (Id. ¶ 22).  Plaintiff alleges that attendees were not "debriefed, advised, instructed,
or informed about the enforcement of EO-117 as it pertained specifically to churches, businesses,
and/or residences" during this meeting.  (Id. ¶ 23).

     After the meeting defendant Abbott sent out the following email detailing "operating
procedures for coronavirus:"



Abbott, Robin   Guard, John; ⊞ Sheriff.10-Shift; ⊞ Sheriff.30-Shift; ⊞ Sheriff.50-Shift; ⊞ Sheriff.70-Shift; Clark, Chad; Congleton, Chauncey; + 1 ⌄    3/16/2020
operating procedure for coronavirus                                               ⌄

This is to advise all staff of the following operating procedure to be in effect as of this writing, 3/16/2020 @ 1730 hrs. and to continue further until advised by
Sheriff Dance.

- Shift Deputies will report directly to their assigned sections. There will be no shift meeting. Information will be passed down by the Lts. And Sgts. There
  will be no service of low level nonviolent misdemeanor warrants or sex offender checks.  In the event enforcement action of a low level
  ,nonviolent  misdemeanors,  the issuance of a citation is strongly encouraged. Lt. or acting Sgts in Lt's absence will have the authority to advise which calls
  for service will be answered. Some calls for service can be answered by telephone calls. Lts or Acting Sgts will decide if a call or personal contact is in
  order.
- Social distancing, stay at least 6 feet away from other persons, keep hands away from face, wash hands often with warm soap and water. Keep cars clean
  and disinfected with Lysol or Microban
- State has ordered that meetings of 100 people or less is the rule at this time.
- High risk calls for service will be determined by information gathered by comm centers both Sheriff's office and 911 center. This applies to medical and
  ordinary calls for service. Please remember that the LT or Sgt have the authority over these calls. You will be advised if a call is high risk.
- It is to advise all Deputies to make good decisions concerning travel and attending any event that exceeds the 100 person limit set by state government at
  this time.
- Constantly monitor your self for signs of the virus, Chest pains, headache, coughing, sore throat, chills or sweats, vomiting, fever.
- DVPO's will be served as usual.
- If you should have questions please contact me. Thanking you in advance for your cooperation in this matter.



(Id. ¶ 24; Exhibit A (DE 1-1) ("COVID-19 procedures email")).

     On March 26, 2020, defendant Abbott emailed PCSD staff regarding whether officers
should stop vehicles:

**Subject:** traffic stops

It has come to my attention that some law
enforcement have been stopping cars and telling
them to go home. We will not stop cars and tell them
to go home for that purpose. If you have reasonable
suspicion and probable cause that a crime has been
committed then it will be handled in the usual way.
Please refrain from stopping cars for the sole
purpose of telling them to go home. If you have
questions please call me. Thank you

Capt  R.M.  Abbott

Capt of Patrol

Pitt Co. Sheriff's Office

(Compl. (DE 1) ¶ 17; Exhibit C (DE 1-3) ("traffic stop email")).

Plaintiff was the "on duty Lieutenant" on April 12, 2020, the Easter Sunday following
issuance of these emails.  (Compl. (DE 1) ¶ 29).  As the "on duty Lieutenant," and pursuant to
Abbott's COVID-19 procedures email, plaintiff alleges he "had the authority to decide what calls
were responded to or not."  (Id.).  Plaintiff received two complaints that day describing gatherings
in violation of EO-117.  (Id. ¶ 30).  One was at a church and the other at a home.  (Id. ¶ 31).  Both
were in connection with Easter Sunday worship.  (Id.).

Plaintiff alleges he "was unclear about how PCSD wanted him to handle" the complaints
"in light of the new policy changes and EO-117."  (Id. ¶ 32).  Exercising the authority he believed
the COVID-19 procedures email granted him, plaintiff elected to "withhold any response" and
emailed defendant Abbott seeking further guidance.  (Id. ¶¶ 32, 33).  Defendant Abbott did not
respond to plaintiff's inquiry.  (Id. ¶ 33).

Plaintiff's reports for the day were as follows:

4

Report #1

On reported date the Sheriff's Office received a complaint of Governor's order, specifically the gathering of more than 10 persons. The location reported was Iglesia Pentecostal Church. I cancelled response of solo officer to this event. Exact procedure, execution, response, and proper [personal protective equipment ("PPE")] have not been disseminated yet so I made the decision to seek those before response occurs. I have requested guidance on the topic.

Report #2

On reported date the Sheriff's Office received a complaint of Governor's Order, specifically the gathering of more than 10 persons. The location reported was [a] residence. I cancelled response of solo officer to this event. Exact procedure, execution, response, and proper PPE have not been disseminated yet so I made the decision to seek those before response occurs. I have requested guidance on the topic.

(Id. ¶ 34 ("Easter reports")).

Upon reviewing these reports, plaintiff alleges defendant Dance "became embarrassed" about the information they revealed and "the potentially adverse implication about defendant Dance's obvious failure to address the delineated issues regarding [COVID-19] policy." (Id. ¶ 36). Allegedly in retaliation, defendant Dance terminated plaintiff's employment. (Id. ¶ 37). According to plaintiff, "[d]efendant Dance could legally retaliate against [plaintiff] by terminating his employment even for 'unfair' reasons because [plaintiff] was an 'at will' employee." (Id. ¶ 38). Defendants Abbott and Guard informed plaintiff of his termination April 15, 2020, effective immediately. (Id. ¶ 39).

Later that same day, defendant Abbott completed a termination report which allegedly "falsely accused" plaintiff with the following:

a. neglect of duty;

b. Being untruthful or knowingly making false, misleading, or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this agency or its members;

5

c. Failure to disclose or misrepresenting material facts, or making false or misleading statement on any application, examination form, or other document, report, or form, or during the course of any work-related investigation; and

d. The falsification of any work-related records, making misleading entries or statements with the intent to deceive, or the willful and unauthorized removal, alteration, destruction and/or mutilation of any agency record, public record, book, paper, or document.

(Id. ¶ 40). Defendant Abbott pointed to plaintiff's Easter reports, asserting the information provided therein did not accurately capture why plaintiff declined to respond to the two calls for service. (Id. ¶ 41). In support, defendant Abbot cited to his COVID-19 procedures email, as well as additional emails he had forwarded to lieutenants in patrol. (Id. ¶ 42). None of these, plaintiff alleges, "addressed the issue of enforcement of EO-117 or PPE policy." (Id. ¶¶ 42, 43). "Additionally, [d]efendant Abbott cited emails sent by the Sheriff's Association, but those communications did not qualify as PCSD directives regarding the departmental policies or procedures on the enforcement of the newly issued EO-117 and PPE policy." (Id. ¶ 43). Defendants Dance, Abbott, and Guard signed the report. (Id. ¶¶ 45, 47). Plaintiff alleges defendants knew the charges of "untruthfulness" were false and without support upon signing. (Id. ¶ 47).

According to the complaint, Sheriff departments in North Carolina are required by statute to file a Form F-5 with the North Carolina Sheriff's Education and Training Standards Commission (the "Commission") "'no later than ten days' after a sworn justice officer separates from employment with the department." (Id. ¶ 49 (quoting 12 N.C.A.C. 10B.0405(a))). On July 28, 2020, after more than three months had elapsed since plaintiff's termination, defendant Dance, or someone on her behalf, filed said Form F-5 with the Commission. (Id. ¶ 50; see Exhibit D (DE 1-4)). Defendants allegedly did not provide an explanation for the dilatory filing. (Id. ¶ 51). On the form, "yes" was affirmatively checked next to the following questions:

6

a. Was this separation a result of a criminal investigation or violation of Commission rules?

b. Are you aware of any on-going or substantiated internal investigation regarding this officer within the last 18 months?

c. Are you aware of any substantiated allegation(s) of untruthfulness regarding this officer?

(Id. ¶ 52). The form was signed by defendant Jacobs. (Id. ¶ 53).

Plaintiff alleges defendants did not provide plaintiff with an opportunity to review or respond to either the termination report or the Form F-5. (Id. ¶ 57). Plaintiff also asserts defendants did not provide him with an opportunity for a hearing to clear his name. (Id. ¶ 59). Because of the statements made in the Form F-5, plaintiff alleges he now must report to prospective law enforcement employers that he was terminated for dishonesty or untruthfulness. (Id. ¶ 60). According to the complaint, it is "well known within the law enforcement industry that when a department accuses a law enforcement officer of untruthfulness . . . [that department is] effectively foreclosing employment opportunities with other law enforcement agencies." (Id. ¶ 46). Following his termination with PCSD, plaintiff has been unable to obtain employment with another law enforcement agency. (Id. ¶ 62).

## COURT'S DISCUSSION

A.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[1] "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-

---

[1]     Internal citations and quotation marks are omitted from all citations unless otherwise specified.

pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.      Analysis

1.      Fourteenth Amendment Procedural Due Process Under 42 U.S.C. § 1983

Plaintiff alleges defendants deprived him of his liberty interests pursuant to the Fourteenth Amendment Due Process Clause by making false statements in both his termination report and the Form F-5.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  To succeed on a due process claim, whether substantive or procedural, "a plaintiff must first show that he has a constitutionally protected liberty or property interest and [second] that he has been deprived of that protected interest by some form of state action."  Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988).

An at-will employee such as plaintiff "has no protected property interest in his employment."  Sciolino v. City of Newport News, Va., 480 F.3d 642, 645 (4th Cir. 2007). However, "a public employer cannot deprive [an] employee of his freedom to take advantage of other employment opportunities."  Id.  "For this reason, a Fourteenth Amendment liberty interest is implicated by public announcement of reasons for an employee's discharge."  Id. at 645-46.

Such claim "arises from the combination of two distinct rights protected by the Fourteenth Amendment: (1) the liberty to engage in any of the common occupations of life and (2) the right to due process where a person's good name, reputation, honor, or integrity is at stake because of

8

what the government is doing to him." Id. at 646. "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Id. Thus, "[w]hen a plaintiff alleges that his termination is based on false, stigmatizing charges that are likely to be inspected by prospective employers, he states a claim that the [public employer] has deprived him of [his] liberty interests." Id. at 649.

Defendants assert plaintiff failed to meet every element required to state a procedural due process claim except the third, conceding that the statements were made in conjunction with plaintiff's termination. Alternatively, defendants assert first that plaintiff received sufficient process, and second that plaintiff does not allege facts demonstrating each individual defendant acted personally in the deprivation of the plaintiff's rights. The court addresses each argument each in turn.

      a.  Stigma

"[A] governmental disclosure places a stigma on a former employee sufficient to give rise to a liberty interest claim if it implies the existence of serious character defects such as dishonesty or immorality." Cannon v. Vill. of Bald Head Island, N. Carolina, 891 F.3d 489, 502 (4th Cir. 2018). "In assessing liberty interest claims," there exists a distinction between "statements that imply such serious character defects from statements that simply allege incompetence." Ridpath, 447 F.3d at 308.

On the facts alleged both the termination report and the Form F-5 accuse plaintiff of dishonesty, and thus stigmatize plaintiff. (See, e.g., Compl. (DE 1) ¶ 40 (termination report accusing plaintiff of "[b]eing untruthful or knowingly making false, misleading, or malicious

statements"); Compl. (DE 1) ¶ 52 (Form F-5 answering in the affirmative that filer was "aware of

. . . substantiated allegation(s) of untruthfulness regarding [plaintiff]")).

Regarding the Form F-5, defendants in opposition parse the form and treat each of the affirmative statements within it separately. While defendants concede that the third statement, indicating the filer was "aware of . . . substantiated allegation(s) of untruthfulness regarding [plaintiff]," stigmatizes plaintiff, they assert the first and second statements, that the termination was "a result of a criminal investigation or violation of Commission rules" and that the filer was "aware of . . . on-going or substantiated internal investigation regarding this officer within the last 18 months," do not. (See DE 28 at 8-9).

Even assuming these two statements standing alone are not stigmatizing, which the court does not decide, reading the form "in the light most favorable to the plaintiff," it is reasonable to infer that an employer's understanding of the first and second statements would be informed by the third. Nemet Chevrolet, Ltd., 591 F.3d at 255. In particular, under this standard, it is plausible to infer that an employer could interpret the form to suggest that the criminal and internal investigations were conducted in connection with plaintiff's alleged dishonesty. Thus, plaintiff has alleged sufficient facts to permit a reasonable inference that those additional statements "placed a stigma on his reputation." Sciolino, 480 F.3d at 645.

Thus, plaintiff has alleged both the termination report and the Form F-5 were stigmatizing.

b.  Public

A public employee "has a right that his personnel file contain no substantially false information . . . when that information is available to prospective employers." Sciolino, 480 F.3d at 648 (emphasis omitted). However, "in order to state a claim under the Due Process Clause, a plaintiff must allege a likelihood that prospective employers will inspect his personnel file." Id.

at 645. "The likelihood standard requires a plaintiff to allege that the personnel file is available to prospective employers, and that those prospective employers not only have permission to, but are likely to, inspect the file." Id. at 650 n.5.

> A plaintiff can meet this standard in two ways. First, the employee could allege (and ultimately prove) that his former employer has a practice of releasing personnel files to all inquiring employers. Second, the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers. In either case, he must allege that the prospective employer is likely to request the file from his former employer.

Id. at 650.

Defendants challenge the publicity element only as to the termination report and not the Form F-5. Turning, then, to the termination report, plaintiff does not allege that PCSD had a practice of releasing personnel files to any employers, inquiring or otherwise. Plaintiff thus fails to allege that his personnel file, including the termination report, was made public. He accordingly has not demonstrated a protected liberty interest in it. Id. at 645.

Plaintiff's arguments to the contrary are unavailing. Plaintiff asserts he met the publicity element by alleging the following:

> Given the unique nature of law enforcement, particularly as pertains to the termination report and the Form F-5 report to the Commission, contents maintained in a personnel file, and the duty for Smith to self-report, as alleged herein, there is a likelihood that prospective employers in law enforcement, as well as the public at large, will inspect, encounter, view, or otherwise be informed about the stigmatizing false allegations . . . ."

(Compl. (DE 1) ¶ 71). That allegation, however, says nothing of PCSD's practice of releasing personnel files to potential employers. Even accepting as true that prospective employers and the public will seek access to the termination report, it is not stated in the complaint that such access will likely be granted. Sciolino, 480 F.3d at 650 ("[A]n employee must allege (and ultimately

prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large <u>will</u> inspect the file." (emphasis added)).

In sum, defendants' motion to dismiss is granted as to plaintiff's procedural due process claim based on the termination report. Still remaining for continued consideration is plaintiff's procedural due process claim based on defendants' filing the Form F-5.

c. False

Defendants argue that even if stigmatizing and made public, there were in fact substantiated allegations that plaintiff spoke untruthfully. Thus, according to defendants, the allegations in the Form F-5 were not false.

Defendants cite to plaintiff's April 12, 2020, Easter reports as containing false statements. (<u>See</u> Defs' Mem. (DE 26) at 9). Within those reports plaintiff explained that he declined to respond to calls alleging EO-117 violations by a church and home as the "[e]xact procedure, execution, response, and proper PPE ha[d] not been disseminated yet." (Compl. (DE 1) ¶ 34, 40-41). Defendants point to defendant Abbott's March 16, 2020, COVID-19 procedures email, excerpted above and attached to plaintiff's complaint, as "clearly demonstrat[ing]" that a policy addressing plaintiff's concerns was in fact already in place. (<u>See</u> Defs' Mem. (DE 26) at 9); <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 448-49 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.").

Reading that email in the light most favorable to plaintiff, it provides that plaintiff, as a lieutenant, had "the authority to advise which calls for service will be answered." (COVID-19 procedures email). It explains that the "state has ordered that meetings of 100 people or less is the rule at this time. . . . [and] all [d]eputies [are] to make good decisions concerning travel and

attending any event that exceeds the 100 person limit." (Id.). It does not delineate what constitutes a "good decision" regarding the 100-person limit, and it makes no mention of PPE. (Id.). Thus, on the facts alleged, plaintiff's statements in his Easter reports that the "[e]xact procedure, execution, response, and proper PPE ha[d] not been disseminated yet" were not untruthful. (Compl. (DE 1) ¶ 34, 40-41).

In sum, plaintiff has alleged sufficient facts to give rise to a plausible inference that defendants made false statements about him in the Form F-5. He has accordingly successfully pleaded that he has a protected liberty under the Due Process Clause.

> d. Sufficiency of Administrative Procedures

Defendants argue that even assuming plaintiff established a protected liberty interest in the Form F-5, defendants made constitutionally adequate procedure available to him.

"If the public employee can establish a protected liberty interest under this framework, the employee is entitled to due process, which in this context involves a name-clearing hearing." Harrell v. City of Gastonia, 392 F. App'x 197, 203 (4th Cir. 2010); see Codd v. Velger, 429 U.S. 624, 627 (1977) ("[T]he hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely to provide the person an opportunity to clear his name."). The Due Process Clause "is not a guarantee against incorrect or ill-advised personnel decisions." Sciolino, 480 F.3d at 649. Rather, it is the guarantee of an opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). Ultimately, "the constitutional harm is not the defamation itself; rather it is the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge." Sciolino, 480 F.3d at 649.

"Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." Zinermon v. Burch, 494 U.S. 113, 126 (1990). "This inquiry . . . examine[s] the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." Id. "Due process . . . is a flexible concept that varies with the particular situation." Id. at 127 (identifying relevant factors).

At the bottom of the Form F-5 it states: the "[o]fficer has the right to submit a written statement of additional information to the Sheriffs' Standards Division regarding this separation." (Exhibit D (DE 1-4)). As noted by defendants, the complaint "does not provide that [p]laintiff ever submitted such a written statement to the Commission in response to the Form F-5 . . . . [and] [t]hat lack of submission appears to be a missed opportunity for appropriate administrative relief as to [p]laintiff's desired name-clearing hearing." (Defs' Reply (DE 33) at 6 n.4). Plaintiff, however, alleges that he was never given the opportunity to review the Form F-5, and indeed his signature is missing from the form. (Compl. (DE 1) ¶ 57; see Exhibit D (DE 1-4)). Construing these facts in the light most favorable to the plaintiff, as well as the fact that defendants allegedly also failed to timely file the form, it appears that regardless of whether the cited procedure is constitutionally adequate, a question the court does not reach, it was not made available in the instant case. Nemet Chevrolet, Ltd., 591 F.3d at 255.

     e. Individual Capacity Claims Against Defendants and Official Capacity Claim Against Defendant Dance

Finally, defendants argue plaintiff fails to establish an affirmative causal connection between each individual defendant and plaintiff's alleged constitutional deprivation. Where

plaintiff's claims against each individual defendant allegedly fail, defendants assert his official capacity claim against defendant Dance must also fail.[2]

Section 1983 provides for liability against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Although § 1983 must be read against the background of tort liability that makes a man responsible for the natural consequences of his actions, liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff['s] rights." Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). "The doctrine of respondeat superior has no application under this section." Id. Thus, plaintiff must allege a "personal connection between [each individual defendant] and any denial of [plaintiff's] constitutional rights." Id.; see Swint v. City of Wadley, 51 F.3d 988, 999 (11th Cir. 1995) ("[42 U.S.C. §] 1983 . . . require[s] proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation.").

Plaintiff alleges that defendants Dance, Abbott, and Guard signed the termination report, and defendant Jacobs signed the Form F-5 on defendant Dance's behalf. (Compl. (DE 1) ¶¶ 45, 47, 53). Plaintiff additionally alleges that when defendants Dance, Abbott, and Guard signed the termination report, they "were aware that the false charges of 'untruthfulness' would likely be included in the [Form F-5]." (Id. ¶ 48). Indeed, according to plaintiff, each defendant made the false charges for the "purpose of causing [him] harm . . . by precluding him from continuing to

<hr>

[2]    Defendants also move to dismiss plaintiff's claims against defendants Abbott, Jacobs, and Guard in their official capacities as duplicative of plaintiff's claim against defendant Dance in her official capacity. See Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006) (holding § 1983 claims against the administrators of a defendant board in their official capacities were duplicative of § 1983 claims against the board). Where plaintiff does not oppose dismissal of these official capacity claims as duplicative, the court grants defendants' motion in this part, and dismisses all claims against defendants Abbott, Jacobs, and Guard in their official capacities.

pursue his occupational field of law enforcement." (Id. ¶ 64). With these allegations, plaintiff successfully pleaded an "affirmative causal connection" between each defendant and the claimed violation of his procedural due process rights. Vinnedge, 550 F.2d at 928.

In arguing to the contrary, defendants assert that "the [c]omplaint contains no allegations as to which of the named [d]efendants forwarded the [d]isciplinary [r]eport to the Commission or which was responsible for advising [p]laintiff that he was entitled to, and/or providing, a name clearing hearing prior to publication." (Defs' Mem. (DE 28) at 10-11). Defendants do not cite to any case law for the requirement the plaintiff must specifically allege as much, and the court's own research has yielded none. Rather, to survive a motion to dismiss plaintiff must simply allege each defendant had a "personal connection" with any denial of his constitutional rights. Vinnedge, 550 F.2d at 928. Here, for the reasons aforementioned, plaintiff has done that. As defendants' argument against plaintiff's official capacity claim is made on the same basis, that too fails.

In sum, plaintiff has successfully pleaded a violation of his procedural due process rights with regard to the Form F-5. Thus, defendants' motion is denied in that part. Plaintiff's procedural due process claim on the basis of his termination report, however, fails for lack of publication, and thus defendants' motion is granted in that part.

2.      Libel

Plaintiff alleges defendants made defamatory statements in the Form F-5. Defendants assert that these statements, even if defamatory, are protected by a qualified privilege. Assuming plaintiff's allegations to be true, the court disagrees.

The term "defamation" encompasses two different torts, that of libel and slander. See Davis v. Askin's Retail Stores, 211 N.C. 551, 553 (1937). Libel includes any false, written publication while slander encompasses a false oral communication. Id. "Defamatory words may

16

be actionable per se, that is, in themselves, or they may be actionable per quod, that is, only upon allegation and proof of special damage." Badame v. Lampke, 242 N.C. 755, 756 (1955). Relevant here:

> "libel per se is a publication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace."

Renwick v. News & Observer Pub. Co., 310 N.C. 312, 317 (1984). Thus, the elements of libel per se are that the "(1) defendant [wrote] base or defamatory words which tended to prejudice [plaintiff] in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published . . . by a third person." West v. King's Dep't Store, Inc., 321 N.C. 698, 703 (1988).

The complaint alleges in substance that defendants falsely accused plaintiff of being terminated for dishonesty and filed that accusation in the Form F-5 with the Commission for publication. It additionally alleges that it is "well known within the law enforcement industry" that when a department accuses a law enforcement officer of untruthfulness it is "effectively foreclosing employment opportunities with other law enforcement agencies." (Compl. (DE 1) ¶ 46). Thus, plaintiff has alleged that defendants' false, defamatory report prejudiced plaintiff in his trade. Taking these allegations as true, plaintiff has stated a claim for libel per se. See Presnell v. Pell, 298 N.C. 715, 719 (1979).

Defendants respond, however, that the Form F-5, if defamatory, was qualifiedly privileged. A defendant can raise the defense of a qualified or condition privilege where:

> (1) [their] communication is made in [g]ood faith, (2) the subject and scope of the communication is one in which the party uttering it has a valid interest to uphold, or in reference to which he has a legal right or duty, and (3) [t]he communication is made to a person or persons having a corresponding interest, right, or duty.

17

Id. at 720; see also Dobson v. Harris, 352 N.C. 77, 81-82 (2000). Clearly a communication is not made in good faith where it is made maliciously. Thus, "[a] communication made under circumstances which otherwise support a finding of conditional or qualified privilege is nevertheless actionable upon a showing of express or actual malice." Presnell, 298 N.C. at 720. To prove malice, the plaintiff must show that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964) (defining malice in the context of the First Amendment); see Varner v. Bryan, 113 N.C. App. 697, 703 (1994) (applying this definition to a defamation claim).

Plaintiff here has alleged that when defendants Dance, Abbott, and Guard signed the termination report they "knew that the unsupported charges of 'untruthfulness' against [plaintiff] were utterly false." (Compl. (DE 1) ¶ 47). Plaintiff additionally alleges that "each of the [d]efendants knew that the allegations of 'untruthfulness' regarding [plaintiff] were patently false, but [nevertheless] had been added to the referenced Form F-5[.]" (Id. ¶ 55). Plaintiff also excerpts or otherwise describes communications that PSCD had so far made regarding EO-117 and PPE and asserts that, given those communications, defendants necessarily knew plaintiff was not untruthful when he reported that the information was incomplete. Plaintiff alleges that defendants nevertheless accused him of untruthfulness "for the dishonest purpose of causing [him] harm . . . by precluding him from continuing to pursue his occupational field of law enforcement." (Id. ¶ 64).

At this stage in the proceedings, such allegations serve to negate the good faith element of qualified privilege. See Presnell, 298 N.C. at 720. Accordingly, defendants' motion is denied in this part.

18

3.      North Carolina Constitution

Plaintiff alleges claims for violation of his due process rights pursuant to Article I §§ 1, 19 21, 35, and 36 of the North Carolina Constitution against defendants in their official capacities. Because plaintiff's claims against defendants Abbott, Jacobs, and Guard in their official capacities are dismissed as duplicative, plaintiff's claim remaining under consideration is his claim as to defendant Dance in her official capacity.

North Carolina law provides that, "in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under [the North Carolina] Constitution." Corum v. Univ. of N. Carolina Through Bd. of Governors, 330 N.C. 761, 782 (1992). An adequate state law remedy exists where there is a cause of action, at common law or created by statute, that provides plaintiff with "the possibility of relief for the same injury alleged in the direct constitutional claim." Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 340 (2009).

Application of immunity to plaintiff's claim is "integral to [the court's] assessment . . . of the adequacy of plaintiff's state law remedy." Id. "[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Id. at 339-40. Thus, a "[p]laintiff's common law cause of action . . . does not provide an adequate remedy at state law when governmental immunity stands as an absolute bar to such a claim." Id. at 340 (emphasis added).

Adequacy is found in chance, however, and not in success or in absolute equivalency. See id. at 339-40; Taylor v. Wake Cnty., 258 N.C. App. 178, 186-87 (2018). Indeed, the North Carolina Supreme Court has indicated an administrative remedy—appeal to the local board of education—may satisfy the opportunity requirement. See Copper ex rel. Copper v. Denlinger, 363

19

N.C. 784, 789 (2010). Similarly, North Carolina courts have held that imposition of an additional element to be proved by the plaintiff does not necessarily render the state remedy inadequate, as even with the added element plaintiff maintains his "opportunity to enter the courthouse doors and present his claim." Craig ex rel. Craig, 363 N.C. at 340; see, e.g., Wilcox v. City of Asheville, 222 N.C. App. 285, 302 (2012). Relevant here, on those grounds, the North Carolina Court of Appeals has held that a remedy is still an adequate alternative to state constitutional claims where the plaintiff must show that the defendant acted with malice to overcome public official immunity. See Wilcox, 222 N.C. App. at 302.

Here, libel provides an adequate avenue for redress of plaintiff's alleged injuries. Though plaintiff must allege defendants acted with malice to overcome qualified immunity, an additional element that would not be required for a constitutional claim, libel still provides the opportunity for plaintiff "to enter the courthouse doors and present his claim." Craig ex rel. Craig, 363 N.C. at 340; see Taylor, 258 N.C. App. at 186-87 ("[B]ecause . . . there was a genuine issue of material fact as to the applicability of public official immunity, the plaintiff still ha[d] a chance to obtain relief[,] regardless of the heightened burden."). Accordingly, plaintiff does not have a claim under the North Carolina Constitution.

Plaintiff's arguments to the contrary are unavailing. Plaintiff asserts that though libel provides a cause of action against defendants in their individual capacities, sovereign immunity bars any claim against defendant Dance in her official capacity. Thus, it is under the North Carolina Constitution that plaintiff can make an official capacity claim. Adequacy of a state law remedy, however, depends upon the injury alleged by a plaintiff, rather than upon the party from whom a plaintiff seeks recovery. See Craig ex rel. Craig, 363 N.C. at 340; Taylor, 258 N.C. App. at 182 ("[O]ur precedent following Corum defines the adequacy of a remedy as a plaintiff's ability

to recover for a particular harm and not as a plaintiff's ability to recover against a particular defendant."). Thus, North Carolina courts have held that that an available remedy against a defendant in her individual capacity is sufficient to preclude a claim under the North Carolina constitution against the defendant in her official capacity. See, e.g., Wilcox, 222 N.C. App. at 302.

Libel thus provides an adequate state law remedy for plaintiff's alleged injuries, thereby barring his claims under the North Carolina constitution. Defendants' motion is therefore granted in this part.

4. Civil Conspiracy

Defendants assert plaintiff's claim for civil conspiracy is barred by the intracorporate conspiracy doctrine. On the facts alleged, the court disagrees.

To establish a claim for civil conspiracy, plaintiff must allege (1) there was a conspiracy; (2) alleged conspirators committed wrongful acts in furtherance of that conspiracy; and (3) plaintiff suffered an injury as a proximate result of the conspiracy. State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444 (2008). In the instant case, plaintiff alleges defendants conspired to and did in fact adopt and disseminate false statements about plaintiff's termination to preclude him from obtaining another law enforcement position. (Compl. (DE 1) ¶¶ 54-56, 84). Plaintiff alleges that because of the conspiracy, he has been unable to find employment with other law enforcement agencies. (Id. ¶ 63). Plaintiff has thus stated a claim for civil conspiracy.

Defendants assert, however, that plaintiff's claim is barred by the intracorporate conspiracy doctrine. Pursuant to that doctrine, "a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility," Marmott v. Maryland Lumber Co., 807 F.2d 1180, 1184 (4th Cir. 1986), as "the acts of corporate agents are attributable to the corporation itself, [and thus] a corporation lacks the multiplicity of actors required to form a

conspiracy," Walters v. McMahen, 795 F. Supp. 2d 350, 358 (D. Md. 2011), aff'd, 684 F.3d 435 (4th Cir. 2012).   Though developed in the antitrust context, "[t]he intracorporate conspiracy doctrine is equally applicable to governmental entities[.]"   Larson by Larson v. Miller, 76 F.3d 1446, 1456 n.6 (8th Cir.1996); see Buschi v. Kirven, 775 F.2d 1240, 1252–53 (4th Cir. 1985) (observing that the doctrine "has been applied in the civil rights area, involving officials of a public body who act within the scope of their employment").

The Court of Appeals for the Fourth Circuit has recognized two exceptions to the intracorporate conspiracy doctrine: (1) "when the officer has an independent personal stake" in the illicit objective, Greenville Pub. Co. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir. 1974); and (2) when the officer's actions are not authorized by the legal entity, Buschi v. Kirven, 775 F.2d 1240, 1252–53 (4th Cir. 1985).   "[The] personal stake exception has been limited, such that it applies only where a co-conspirator possesses a personal stake independent of his relationship to the corporation." ePlus Tech., Inc., 313 F.3d at 179.   In applying the personal stake exception, courts should be wary of allowing it to "swallow the rule." Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 705 (4th Cir. 1991) ("Since Greenville was decided . . . this exception has expanded and in the process has been criticized for, among other things, becoming an exception that threatens to swallow the rule.").

Plaintiff alleges that defendant Dance falsely accused him of untruthfulness in retaliation for his Easter reports as she "became embarrassed about the truth of the substantive content contained in the reports being disclosed or disseminated and the potentially adverse implication about defendant Dance's obvious failure to address the delineated issues regarding [COVID-19] policy."  (Compl. (DE 1) ¶¶ 36-37).  Dance's alleged personal interest in terminating plaintiff because he drew attention to her shortcomings as sheriff is, on the facts alleged, independent of,

and likely even adverse to, PCSD.  For if plaintiff was indeed shining light on a failure to disseminate vital information regarding enforcement of EO-117 and PPE in the midst of a public health crisis, it would be in PCDS's interest to address that concern rather than simply terminating plaintiff's employment because he identified it.  See ePlus Tech., Inc., 313 F.3d at 180 ("In siphoning money out of MBT, Aboud personally profited at MBT's expense.  In such a situation, the personal stake exception squarely applies[.]").

Plaintiff alleges defendants Abbott, Guard, and Jacobs knowingly collaborated in this scheme and sought to "preclud[e] him from continuing to pursue his occupational field of law enforcement."  (Compl. (DE 1) ¶ 64; see id. ¶¶ 47, 54-56).  Though a closer call, construing this allegation in the light most favorable to plaintiff, particularly with regard to defendant Abbot who disseminated the emails regarding COVID-19 protocols, the court infers defendants Abbott, Guard, and Jacobs were similarly driven by a desire to retaliate against plaintiff for calling attention to their inadequate directives regarding enforcement of EO-117 and PPE policy. See Nemet Chevrolet, Ltd., 591 F.3d at 255.

In sum, plaintiff has stated a claim for civil conspiracy, and defendants' motion is denied in this part.

## CONCLUSION

Based on the foregoing, defendants' motion (DE 27) is GRANTED IN PART and DENIED IN PART, as set forth herein.  Plaintiff's procedural due process claim based on the termination report and his claim under the North Carolina Constitution are DISMISSED WITHOUT PREJUDICE.  Plaintiff's claims against defendants Abbott, Jacobs, and Guard in their official capacities are DISMISSED WITH PREJUDICE.  Plaintiff's remaining claims are ALLOWED to

proceed, comprising the following: plaintiff's procedural due process claim based on the Form F-5, and plaintiff's second and fourth claim in their entirety.

Where the parties' scheduling activities were previously stayed pursuant to this court's order entered December 9, 2021, the court now LIFTS that stay. Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), a responsive pleading must be served within 14 days of this order.

SO ORDERED, this the 1st day of July, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge